UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-60943-CIV-DIMITROULEAS/SNOW

BOBBY TUCKER,

     Plaintiff,

     vs.

KILOLO  KIJAKAZI, ACTING
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

     Defendant.
_____/

## REPORT AND RECOMMENDATION

This cause is before the Court on Plaintiff's Complaint seeking judicial review of a final decision of the Social Security Administration denying the Plaintiff's application for disability benefits.  The Complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 401, et seq., and was referred to United States Magistrate Judge Lurana S. Snow for Report and Recommendation.

## I. PROCEDURAL HISTORY

The Plaintiff filed an application for Supplemental Security Income (SSI) benefits on April 22, 2019, alleging disability since March 1, 2016, as a result of epilepsy, post traumatic stress disorder (PTSD), traumatic brain injury and brain atrophy.  The application was denied initially and upon reconsideration.  The Plaintiff then requested a hearing, which was held before Administrative Law Judge James Andres on December 7, 2020.  The Administrative Law Judge (ALJ) found that the Plaintiff was not disabled within the meaning of the Social Security Act.  The Appeals Council denied the Plaintiff's request for review on March 11, 2021.  The Plaintiff then filed this action seeking judicial review of the decision of the Commissioner.

## II. <u>FACTS</u>

The Plaintiff was born on February 27, 1981.  His past relevant work was as a real estate agent.  The Plaintiff has not worked since he was struck by a vehicle in 2016. (R:33, 43, 48-49)

The medical record reflects that on April 3, 2017, the Plaintiff was transported to the emergency department of the Northside Hospital Forsyth.  Ambulance notes indicate that the Plaintiff had a history of alcohol abuse and alcohol withdrawal seizures. He had suffered a seizure that morning, causing him to fall and hit his had.  The Plaintiff stated that his last drink was on the preceding day, but he smelled of alcohol.  In the hospital, the Plaintiff denied daily drinking and stated that his last drink had been one week ago.  During the nursing assessment the Plaintiff was cooperative, alert and fully oriented.  He reported that he had a history of seizures and had been diagnosed with epilepsy, but had not had a seizure for 4-5 years and was not taking any anti-seizure medication.  The Plaintiff denied any history of alcohol-related seizures, as well as any back or neck pain.  Physical examination of his back and extremities yielded normal results with no tenderness and normal strength.  He was discharged with a prescription for Keppra.  (R:358-63)

On February 28, 2018, the Plaintiff was taken to the emergency department of Broward Health North for medical clearance.  He complained of chronic pain as the result of his 2016 accident.  On examination, the Plaintiff was alert and in no acute distress.  He was oriented in all spheres and was cooperative, with appropriate mood and affect and normal judgment.  The examiner observed no focal neurological deficits, as well as normal speech, motor and coordination.  The Plaintiff was able to ambulate with a steady unassisted gait.  Musculoskeletal examination

revealed normal range of motion and strength. The Plaintiff was medically cleared and discharged to home. (R:389-91)

On September 7, 2018, the Plaintiff was brought to the emergency department of Broward Health North for alcohol intoxication. His blood alcohol level was .428. When the Plaintiff's gait became normal, his speech cleared and he was oriented in all spheres, he asked to leave and was released. On July 4, 2019, the Plaintiff again was brought to the emergency department of Broward Health North for alcohol intoxication. His blood alcohol level was .464. His documented medications were Neurontin, Zoloft, acetaminophen and omeprazole. A CT scan of the Plaintiff's brain showed no evidence of acute intracranial process, but did reveal a volume loss in excess of that expected for someone of the Plaintiff's age. (R:400-02, 447-449, 464-67, 479)

On July 23, 2019, the Plaintiff presented to AdventHealth as the result of seizures which had occurred that morning and the night before. The Plaintiff's mother accompanied him, and told the consulting physician, Amanda Lynn Cheshire, M.D., that the Plaintiff had last drunk alcohol the preceding morning. Dr. Cheshire's diagnostic impression was epileptic seizure vs. alcohol withdrawal seizure vs. non-epileptic event (i.e. pseudoseizure). She noted that more information was needed to determine whether the Plaintiff needed to be on anti-epileptic medications and indicated that she would obtain his hospital records. (R:483-85)

Physical examination at AdventHealth was performed by a physician's assistant and revealed that the Plaintiff was alert, in mild distress, anxious and asking for Valium. He was oriented in all spheres; had no focal neurological deficits and his speech, senses, motor ability and coordination all were normal. The Plaintiff was cooperative with appropriate mood and affect. His back was non-tender with normal

3

range of motion and alignment.  Musculoskeletal examination showed normal range of motion and strength, and no tenderness, swelling or deformity.  (R:477)

On August 1, 2019, a consultative physical examination of the Plaintiff was performed by James R. Shoemaker, D.O.  The Plaintiff told Dr. Shoemaker that he had been diagnosed with epilepsy following a motor vehicle accident and pedestrian injury in 2016.  Anti-seizure medication was prescribed, but the Plaintiff had not continued with the medication owing to its cost.  The Plaintiff stated that he had experienced 5 grand mal seizures within the past month, the most recent of which lasted about 4 hours and resulted in a hospital admission.  He related that he could not drive or grocery shop, but could dress himself, sometimes with help from his mother.  The Plaintiff also complained of PTSD and anxiety, as well as chronic lower extremity and pelvic pain and chronic right extremity weakness.  The Plaintiff was not taking any medication and had never seen a therapist.  He admitted to smoking ½ pack of cigarettes per day, but described himself as a non-drinker. (R:498-99)

Physical examination revealed some right-sided lumbosacral spine point pain, as well as some paraspinal muscle point tenderness, mainly on the right side. The Plaintiff refused to perform a straight leg raise test with his right lower extremity, which he claimed would "pop out" if he tried to raise his right leg.  Left supine straight leg raise was negative.  Grip strength on the Plaintiff's right upper extremity was 2/5, and there was some instability on the right lower extremity.  However, Dr. Shoemaker noted some obvious malingering in testing the muscle strength of the right lower extremity.  The Plaintiff was unable to tandem walk owing to instability, but did not use an assistive device to ambulate.  The doctor's diagnostic impressions were epilepsy,

grand mal seizures, post-traumatic stress disorder, anxiety disorder, history of skull fracture, history of motor vehicle accident/pedestrian injury, chronic pelvic pain, lumbar radiculopathy and muscle weakness. (R:499-501)

On August 12, 2019, Michael Plasay, Ph.D., a non-examining state agency psychologist, assessed the Plaintiff's mental impairments and completed a Psychiatric Review Technique form. Dr. Plasay stated that the Plaintiff's primary impairment was epilepsy, which was severe. He also suffered from non-severe secondary impairments of anxiety and obsessive-compulsive disorder, trauma and stress-related disorders and substance addiction disorder (alcohol). Dr. Plasay mentioned emergency room visits by the Plaintiff in July 2019 at which he was diagnosed with acute alcohol intoxication. He noted that the evidence of the Plaintiff's mental impairments was only partially consistent, and there appeared to be an over-endorsement of symptoms in the Plaintiff's activities of daily living in connection with memory and concentration deficits. (R:53-54)

On August 9, 2019, Allison Trowbridge, M.D., a non-examining state agency physician, completed a Physical Residual Functional Capacity assessment of the Plaintiff. Dr. Trowbridge opined that the Plaintiff had no exertional, manipulative, visual or communicative, limitations. The Plaintiff did have some postural and environmental limitations in that he could only occasionally climb ramps/stairs, could never climb ladders/ropes/scaffolds and needed to avoid exposure to hazards such as machinery and heights. Dr. Trowbridge noted that review of the medical evidence of record showed that the Plaintiff did have a seizure disorder, but also showed non-compliance with seizure medication as well as alcohol abuse. The doctor referred to the consultative examination and the Plaintiff's October 15, 2018 emergency room visit, both of which noted that the Plaintiff did not take his seizure medications, and

emergency room visits on July 4 and July 8, 2019, when the Plaintiff was intoxicated. Dr. Trowbridge stated that compliance with medication and cessation of alcohol use would result in improvement of the Plaintiff's seizure condition. The doctor's findings were affirmed by Phillip Matar, M.D., another non-examining state agency physician, who completed a Physical Residual Functional Capacity Assessment of the Plaintiff on September 17, 2019. (R:55-56, 67-69)

On September 18, 2019, Jane Cormier, Ph.D., a non-examining state agency psychologist completed a Psychiatric Review Technique Form relating to the Plaintiff. Dr. Cormier identified a primary impairment of epilepsy and a secondary impairment of substance addiction disorder (alcohol). The Plaintiff also suffered from a personality and impulse-control disorder, which resulted in no limitations in the Plaintiff's ability to understand, remember or apply information, and mild limitations in the Plaintiff's abilities to interact with others; concentrate, persist or maintain pace, and adapt or manage himself. Dr. Cormier concurred with Dr. Plasay's comments regarding the Plaintiff's emergency room visits for acute alcohol intoxication and the inconsistency of the psychological evidence of record. Although the Plaintiff reported suffering from PTSD, there was no evidence of treatment for this condition while the Plaintiff was incarcerated and no other history of mental health treatment. Updated records showed that although the Plaintiff was a poor historian, there was no evidence of a discrete cognitive impairment. (R:65-66)

On December 16, 2019, a competency evaluation with neuropsychological examination of the Plaintiff was performed by Alejandor A. Arias, Psy. D. in connection with pending criminal charges against him. Dr. Arias was unable to arrive at a valid conclusion regarding the Plaintiff's competency as the result of the Plaintiff's lack of significant cooperation and unwillingness to answer questions. However, based solely

on the Plaintiff's clinical presentation, there were some indications of cognitive deficits and behavioral difficulties, likely associated with either a psychiatric disturbance and/or a neurocognitive disorder.  The Plaintiff admitted to smoking 2 packs of cigarettes per day, but denied substance abuse or alcohol intake.  However, the Plaintiff did recall a DUI charge in 2002.  Dr, Arias was unable to form a diagnostic impression or restorative prognosis.  (R:893-96)

On January 20, 2020, the Plaintiff was brought to AdventHealth Palm Coast as the result of a seizure which had occurred just prior to his arrival.  The Plaintiff reported that he had no back, muscle or joint pain; no headache, dizziness or weakness, and no anxiety or substance abuse.  Physical examination of the Plaintiff's back showed that it was non-tender with normal range of motion and alignment. Musculoskeletal examination revealed normal range of motion and strength, with no swelling, tenderness or deformity.  The Plaintiff was alert and oriented in all four spheres, and was cooperative, with appropriate mood and affect.  No focal neurological deficit was observed, and the Plaintiff had normal senses, motor ability, speech and coordination.  A CT scan of the Plaintiff's head/brain showed no evidence of intracranial abnormality, and no mass, hemorrhage or evidence of acute infarction. No volume loss was noted.  Differential diagnosis was grand mal seizure, and the Plaintiff was given prescriptions for Dilantin and Librium.  (R:513-17)

On March 20, 2020, the Plaintiff was brought to the Emergency Department of Broward Health North for treatment of an injury to his nose which apparently had occurred while he was sleeping.  The Plaintiff was alert and cooperative and physical examination yielded normal results.  A CT scan of the Plaintiff's brain revealed no acute intracranial abnormalities and there was no mention of volume loss.  (R:531-35)

On January 30, 2020, the Plaintiff was referred to the behavioral health provider at the Broward County Jail for detox. On February 1, 2020, a Behavioral Health Initial Evaluation of the Plaintiff was performed at the jail. The Plaintiff told the evaluator that he had extreme PTSD, having been hit by a car going 80 miles per hour. Mental status examination revealed that the Plaintiff's appearance, speech, mood and affect all were appropriate; thought content was coherent, and thought form was appropriate. The Plaintiff was oriented in all spheres and was of average intelligence. His memory, insight and judgment all were intact, and his behavior was appropriate. The Plaintiff admitted to using alcohol, but denied any history of mental health treatment and appeared to be stable. On February 11, 2020, progress notes at the jail reflect that the Plaintiff was reporting daily flashbacks and was asking for medication. Mental status examination was essentially the same, with the addition of hallucinations. (R:551-55,559-64, 567)

On March 4, 2020, Marie Defeo, Psy.D., performed a competency evaluation of the Plaintiff in connection with the pending criminal proceedings. Dr. Defeo noted that the Plaintiff struggled to provide personal information as the result of memory impairment and circuitous speech. The Plaintiff related that he had been diagnosed with PTSD, Generalized Anxiety Disorder and Neurocognitive Disorder, but stated that there was no medicine to help fix his memory or the way he spoke and thought. The Plaintiff stated that he suffered from a severe seizure disorder and continued to have multiple seizures weekly despite the medication that had been prescribed. The Plaintiff denied any history of substance abuse. Dr. Defeo noted that the Plaintiff shuffled into the interview room and held his right arm rigidly across his abdomen. The Plaintiff explained that he had lost mobility in the entire right side of his body. (R:526)

8

Dr. Defeo noted that on mental status examination, the Plaintiff was oriented as to person and place, but not as to time and situation. His concentration skills were poor and while his recent memory was only mildly impaired, his remote memory was grossly impaired. The Plaintiff lacked the ability to relay clear and coherent thought and his social judgment was odd and impaired. Dr. Defeo's diagnostic impressions were Major Neurocognitive Disorder, Generalized Anxiety Disorder by history, Major Depressive Disorder Recurrent and Post Traumatic Stress Disorder (Chronic). The doctor found the Plaintiff to have inadequate capacities to appreciate the charges against him; appreciate the range and nature of potential penalties; understand the adversarial nature of the judicial process; disclose pertinent information to counsel; manifest appropriate courtroom conduct (by interrupting the proceedings), or testify relevantly. Accordingly, Dr. Defeo concluded that the Plaintiff was incompetent to proceed with the judicial process. She assessed that he was not likely to benefit from restoration training because of the organic and progressive nature of his cognitive functioning. (R:527-28)

On October 9, 2020, another mental competency evaluation of the Plaintiff was performed by Karen T. Dann, Ph.D. Dr. Dann noted that the Plaintiff often rambled, repeated himself and spoke over the examiner. His attention and concentration efforts were wavering, as he had difficulty completing cognitive tasks and remaining abreast of more complex inquiries. He struggled to respond to open-ended questions in a goal-directed and organized fashion and required ongoing redirection. The Plaintiff consistently exhibited deficits with immediate and recent memory and he did not present as a reliable historian. He exhibited deficits in organizing, planning and prioritizing information. The Plaintiff also failed to provide clear information regarding the treatment he received after his motor vehicle accident.

9

Dr. Dann concluded that the Plaintiff's capacities were inadequate in all areas pertinent to the issue of competency and concluded that he was not competent to assist in the upcoming legal proceedings. (R:897-900)

  At the evidentiary hearing on December 7, 2020, the Plaintiff testified that he is unable to work as the result of seizures and flashbacks. He stated he experienced about 1 seizure per week, with the bad seizures occurring once every 2 to 3 weeks. He explained that the bad seizures caused his muscles to tear, rendering him unable to walk for 1-4 weeks after a seizure. On very rare occasions the Plaintiff lost control of his bowels during a seizure. Various medications had been prescribed for him,, including Dilantin, gabapentin and Neurontin, but he was unable to afford them. (R:33-37)

  The Plaintiff stated that he suffered from flashbacks to the motor vehicle accident, sometimes causing him to be immobile for 20 minutes. He also suffered from nightmares which made it difficult for him to sleep. The Plaintiff related that he had short-term memory problems and trouble concentrating. (R:37-38)

  Regarding physical limitations, the Plaintiff testified that he had difficulty standing and walking, and spent most of his time sitting down. Even while seated, the Plaintiff needed to change positions regularly. Additionally, his hand tremors made it difficult for him to eat. (R:39-41)

  In response to questioning by the ALJ, the Plaintiff acknowledged that he had refused Dilantin while in prison because he would not be able to afford it upon release. Regarding his alcohol use, the Plaintiff described himself as "a lightweight," adding that on rare occasions he would drink a couple of beers when friends came over. The Plaintiff stated that his seizures definitely were not caused by alcohol. (R:42-43)

Jeannine M. Salek, a vocational expert (VE) identified the Plaintiff's past relevant work as a real estate agent, defined as light work with an SVP of 5. The VE was asked to consider a person of the Plaintiff's age, education and vocational background. who was able to perform work at all vocational levels, except that he could only occasionally climb ramps and stairs, but could never climb ladders, ropes or scaffolding and had to avoid even moderate exposure to hazards such as machinery and heights. She stated that such a person could perform the Plaintiff's past job as a real estate agent. (R:42-44)

In response to questions by counsel for the Plaintiff, the VE stated that would not be able to do this job or other jobs in the national economy if he could only occasionally use his dominant hand to handle, finger or feel. Similarly, there would be no jobs the Plaintiff could perform if he would be off-task 15% of the time and/or were absent 2 days per month. (R:44-45)

### III. <u>DECISION OF THE ALJ</u>

The ALJ first found that the Plaintiff had not engaged in any substantial gainful activity since his application date of April 22, 2018, and had the severe impairment of epilepsy. The ALJ determined that the Plaintiff's other impairments of brain atrophy, history of motor vehicle accident resulting in traumatic brain injury and pain, PTSD and alcohol abuse disorders were not severe. (R:14-16)

Regarding the Plaintiff's brain atrophy, the ALJ noted that the Plaintiff had a CT scan of his brain in July 2019 which showed evidence of volume loss in excess of that which could be expected for his age, but subsequent CT scans performed on January 20 and March 20, 2020 depicted no evidence of volume loss. Additionally, there was no indication of ongoing treatment or documentation in the form of clinical,

radiological or neurological evidence that the Plaintiff suffered any functional limitation from brain atrophy. (R:15)

As to the Plaintiff's traumatic brain injury (TBI) and pain in his pelvis and right lower extremity, which the Plaintiff claims occurred at the time of his motor vehicle accident, the ALJ pointed out that CT scans of the Plaintiff's brain performed during the time period of July 23, 2019 to March 20, 2020, revealed no evidence of acute intracranial abnormality, mass, hemorrhage or acute infarction. With regard to pain, consultative examiner Dr. Shoemaker did observe some right-handed spine point pain, as well as some right side paraspinal muscle point tenderness, and reported that the Plaintiff had refused to perform straight leg raise testing on the right leg, claiming that he was unable to raise that leg. However, straight leg test on the left was negative and the Plaintiff had essentially full range of motion in the lower extremities. Dr. Shoemaker noted some diminished range of motion in the lumbar spine as well as in the right shoulder, wrist and hip. Additionally, the Plaintiff had diminished grip strength in the right upper extremity and some point tenderness in the right shoulder, elbow and wrist. Despite these findings at the consultative examination, the ALJ noted that the numerous other physical examinations in the record revealed no objective deficits or abnormal findings concerning the Plaintiff's right upper extremity, suggesting that these symptoms had improved. (R:15-16)

The ALJ further noted that during Dr. Shoemaker's examination, the Plaintiff was able to get on an off the examination table slowly, and walked without the use of an assistive device. While the Plaintiff had some instability in his right lower extremity and thus was unable to perform tandem walking, Dr. Shoemaker observed obvious malingering when testing the Plaintiff's muscle strength in that extremity. The doctor's diagnostic impression was history of motor vehicle accident/pedestrian

injury, chronic pelvic pain, lumbar radiculopathy, and muscle weakness, but treatment notes from the Plaintiff's examining medical providers showed that the Plaintiff repeatedly exhibited normal range of motion with no mention or neurological deficits. The ALJ pointed out that a February 28, 2018 medical report revealed that the Plaintiff was able to ambulate with a steady unassisted gait and physical examination revealed that he had no motor or coordination deficits.  Accordingly, the ALJ found that the record did not document any ongoing problems or functional limitations in these areas.  (R:16)

With respect to the Plaintiff's PTSD and alcohol abuse disorder, the ALJ found that these mental impairments did not cause more than minimal limitations in the Plaintiff's abilities to perform basic mental work activities.  Although the record reflected that the Plaintiff had been diagnosed with PTSD, mental status examinations and objective physical examinations revealed normal clinical findings, such as a calm and cooperative demeanor with intact cognitive function.  Moreover, the Plaintiff stated in January 31, 2020 that he was not taking any medication for PTSD, and during his consultative examination by Dr. Shoemaker, the Plaintiff denied any history of psychiatric medication or therapy.  Id.

The ALJ also noted that the Plaintiff had a history of alcohol abuse marked by withdrawal symptoms of nausea, vomiting and diarrhea (which did not support the Plaintiff's testimony that his bowel incontinence resulted from seizures). The ALJ observed that the record documented numerous hospital visits secondary to acute alcohol intoxication between July 4 and July 19, 2018, marked by an altered mental status.  On July 4, 2019, despite a very high blood alcohol level, the Plaintiff was oriented in two spheres and on July 22, 2019 the Plaintiff was admitted to the hospital for acute alcohol intoxication, but left against medical advice.  (R:16-17)

13

After summarizing the competency findings of Drs. Arias, Defeo and Dann (R:17-18), the ALJ addressed the broad areas of mental functioning.  In the area of understanding, remembering or applying information, the ALJ determined that the Plaintiff had no limitations.  The ALJ pointed out that the Plaintiff repeatedly had demonstrated intact orientation within four spheres and alert cognitive function.  On February 2020, the Plaintiff displayed intact memory and insight and grossly normal orientation.  (R:18)

In the area of interacting with others, the ALJ found that the Plaintiff had mild limitations.  The ALJ noted that the Plaintiff had been characterized on examination as calm, cooperative and pleasant with normal judgment, appropriate mood and affect and no speech deficits.  In a February 1, 2020 mental status examination, as well as the examination of February 11, 2020, the Plaintiff demonstrated calmness, cooperativeness and intact judgment, as well as appropriate behavior, mood, affect and speech.  Id.

In the area of concentrating, persisting or maintaining pace, the Plaintiff also had mild limitations.  The ALJ emphasized once again that the Plaintiff had been assessed as oriented and alert with normal cognitive functioning except when intoxicated.  During the Plaintiff's February 1 and February 11, 2020 mental status evaluations, the Plaintiff evidenced coherent thought form, appropriate thought content and average intelligence.  (R:18-19)

In the final are of adapting or managing himself, the Plaintiff again had mild limitations.  The record was devoid of any evidence of mental health treatment or psychiatric hospitalizations. The Plaintiff denied both hospitalizations or outpatient mental health treatment.  During examinations the Plaintiff was cooperative, calm and pleasant with appropriate behavior and no signs of acute distress.  Based on his

14

findings in these four areas, the ALJ determined that the Plaintiff's mental impairments were not severe. (R:19)

The ALJ next found that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ determined that the Plaintiff retained the residual functional capacity to perform work at all exertional levels, except that he could only occasionally climb ramps and stairs, but could never climb ladders, ropes or scaffolds and needed to avoid even moderate exposure to hazards, including moving machinery, unprotected heights and motor vehicles. The ALJ assessed that the Plaintiff's statements regarding the intensity, persistence and limiting effects of his symptoms were inconsistent because, although the record established the existence of a seizure disorder, the Plaintiff had not received the type of medical treatment one would expect of a disabled individual. There was evidence in the record that the Plaintiff had not been entirely compliant in taking prescribed medications, suggesting that his symptoms might not be as limiting as the Plaintiff had alleged. (R:19-21)

The ALJ noted that on the Plaintiff's July 4, 2019 visit to the emergency room, the Plaintiff did not include in his list of medications any anti-epileptic medicines. During his July 23, 2019 emergency room visit, the Plaintiff admitted that he was not taking any medication for his seizures and stated that he needed Valium. The Plaintiff's mother also reported that the Plaintiff was not taking any anti-seizure medications and described the Plaintiff as a heavy drinker. The Plaintiff was completely asymptomatic during this visit, and the evaluating physician believed that the Plaintiff had suffered a pseudo-seizure related to alcohol abuse. This was supported by the fact that the Plaintiff was awake, alert and oriented with fluent

speech, intact naming and intact repetition.  He had no motor deficits, facial abnormalities, ptosis or abnormalities of the pupils.  There were no signs of tremor or of sensory or coordination deficits.  A urine test revealed the presence of cannabis, and a CT scan of the Plaintiff's brain showed no evidence of acute intracranial process. (R:21)

The ALJ pointed out that the Plaintiff also told Dr. Shoemaker that he was not taking any medications. On August 11, 2019, at the time of an arrest, the Plaintiff stated that he had stopped taking Dilantin 8 weeks earlier and was trying a holistic approach.  However, treatment notes indicated that the Plaintiff's seizures generally had been controlled with Dilantin.  During an emergency room visit on November 16, 2019, the Plaintiff stated that he was supposed to be on either Dilantin or Valium.  He added that Dilantin had been prescribed for him, but he had not taken it for several months because of insurance issues.  At that visit, the Plaintiff showed no external signs of trauma, and an objective physical examination yielded normal results, with cognitive function intact.  The Plaintiff was discharged the same day with a prescription for Dilantin.  (R:22)

The ALJ also mentioned a medical clearance examination of the Plaintiff on February 28, 2018, at which time he was alert, oriented in all spheres with no focal neurological, motor or coordination deficits.  There was no indication that the Plaintiff had reported having seizures. Additionally, at an emergency room visit on January 20, 2020, at which the Plaintiff complained of a seizure earlier that day, he was alert and oriented in all spheres with no focal neurological, sensory, motor, speech or coordination deficits.  Although the Plaintiff reported having bitten his tongue during the seizure, examination revealed no sign of injury to the tongue.  Id.

Regarding the opinion evidence, the ALJ found Dr. Defoe's opinion concerning the Plaintiff's cognitive functioning to be unpersuasive because at the administrative hearing the Plaintiff was able to testify in detail about his car accident, injuries, surgery and other matters. Additionally, her opinion was inconsistent with the evidence of record which repeatedly showed on objective examination that the Plaintiff was oriented in three or four spheres. The doctor's assessment that the Plaintiff was unable to care for himself also was inconsistent with the Plaintiff's Function Report, in which he stated that he had no problems handling his personal care. (R:23)

The ALJ also found Dr. Dann's opinion to be unpersuasive because her view that the Plaintiff had cognitive deficits and required psychiatric management and restoration was unsupported by the overall longitudinal objective medical record, which is devoid of any psychiatric treatment from a mental health provider. Additionally, the record was replete with evidence of the Plaintiff's alcohol abuse/addiction, which coincided with his having an altered mental status. The ALJ found partially persuasive Dr. Arias' opinion that the Plaintiff had cognitive deficits and behavioral difficulties that likely were attributable to a psychiatric disturbance and/or neurocognitive disorder. The ALJ based this on record evidence that the Plaintiff had some deficits or difficulties secondary to epilepsy, a neurological disorder. However, the record contained no evidence of any mental health treatment other than hospital treatment on numerous occasions for acute alcohol intoxication, thus the record did not support Dr. Arias' opinion that the Plaintiff had a psychiatric disturbance. The ALJ found the opinions of the non-examining state agency physicians and psychologists to be persuasive because they were supported by the overall medical record. Id.

The ALJ stated that his residual functional capacity of the Plaintiff was supported by the Plaintiff's lack of treatment compliance with prescribed medication, which conflicted with his hearing testimony that medications had been ineffective. The ALJ also noted that the Plaintiff had worked after his alleged onset date, and although this work was not disqualifying substantial gainful activity, it did indicate that the Plaintiff's daily activities, at least at times, had been somewhat greater than the Plaintiff had generally reported. Based on the testimony of the VE, the ALJ found that the Plaintiff retained the residual functional capacity to perform his past work as a real estate agent. The ALJ also found that there was no objective medical basis for the additional limitations contained in the hypotheticals posed to the VE by counsel for the Plaintiff. Accordingly, the ALJ concluded that the Plaintiff was not under a disability for purposes of the Social Security Act. (R:24-25)

## IV. CROSS MOTIONS FOR SUMMARY JUDGMENT

The Plaintiff seeks reversal or remand on three grounds: (1) the ALJ's erred in finding that the Plaintiff's brain atrophy and TBI are not severe impairments which impacted his ability to work; (2) the ALJ erred in failing to include in the hypothetical presented to the VE the limitation that the Plaintiff could have only moderate exposure to motor vehicles, and (3) the ALJ and the Appeals Council lacked authority because the statute governing removal of the Commissioner is unconstitutional.

The Commissioner contends that the decision of the ALJ must be affirmed because it is supported by substantial evidence and the correct legal standards were applied.

## V. <u>RECOMMENDATIONS OF LAW</u>

At issue before the Court is whether the final decision of the Commissioner, as reflected by the record, is supported by substantial evidence. "Even if the evidence preponderates against the Secretary, we must affirm if the decision is supported by substantial evidence." <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1985). Substantial evidence is defined as such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389 (1971); <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233 (11th Cir. 1983). The Court must review the record as a whole to determine if the decision is supported by substantial evidence. <u>Bloodsworth</u>, 703 F.2d at 1239. The Court must also determine whether the Administrative Law Judge applied the proper legal standards. No presumption of validity attaches to the Commissioner's determination of the proper legal standards to be applied. <u>Davis v. Shalala</u>, 985 F.2d 528, 531 (11th Cir. 1993) (citing <u>Bridges v. Bowen</u>, 815 F.2d 622, 624 (11th Cir. 1987)).

In making a disability determination, the ALJ must perform the sequential evaluation outlined in 20 C.F.R. § 404.1520. First the claimant must not be engaged in substantial gainful activity after the date the disability began. Second, the claimant must provide evidence of a severe impairment. Third, the claimant must show that the impairment meets or equals an impairment in Appendix 1 of the Regulations. If the claimant fails to provide sufficient evidence to accomplish step three, the analysis proceeds to step four. In step four, the ALJ must determine the claimant's residual functional capacity, then determine if the claimant can perform his or her past relevant work. The claimant has the burden of proving the inability to perform past relevant work. If the claimant's evidence shows an inability to perform past relevant work, the burden shifts to the ALJ in step five. The ALJ must show that

19

there is other gainful work in the national economy which the claimant can perform. Once the ALJ identifies such work, the burden returns to the claimant to prove his or her inability to  perform such work.

### A. Assessment of the Plaintiff's Mental Impairments

The Plaintiff's first argument is that the ALJ's residual functional capacity was not based on substantial evidence because it did not include the impact of the Plaintiff's brain atrophy and TBI.  In support of his argument, the Plaintiff relies primarily on the opinions of the three psychologists who evaluated the Plaintiff's competence to participate in pending criminal proceedings.  The Plaintiff emphasizes that these opinions were not reviewed by the state agency psychological consultants and no consultative psychological evaluation was ordered.

For claims filed after March 27, 2017, 20 C.F.R. § 1520c(a) provides that no deference or specific evidentiary weight, including controlling weight, is to be given to any medical opinion or prior administrative finding, including those of a treating source.  Instead, each opinion or prior finding is evaluated by considering the factors set forth in § 1520c(c): (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of treatment relationship and examining relationship; (4) specialization, and (5) other factors, such as familiarity with the other evidence in the claim or an understanding of  the program's policies and evidentiary requirements. Of these factors, the most important are supportability and consistency.  The regulations state that the "more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be" 20 C.F.R. § 1520c(c)(2).

The ALJ found that the Plaintiff's alleged brain atrophy and TBI were not severe impairments because CT scans performed on January 20 and March 20, 2020 showed no evidence of volume loss or of acute intracranial abnormality, mass, hemorrhage or infarction. Additionally, there was no indication of ongoing treatment or documentation in the form of clinical, radiological or neurological evidence that the Plaintiff suffered any functional limitation from brain atrophy or TBI.

The ALJ found the opinion of Dr. Arias, who was unable to form a diagnosis or a competency assessment because of the Plaintiff's lack of cooperation, to be partially persuasive to the extent that Dr. Arias opined that the Plaintiff suffered from a neurocognitive disorder, since the Plaintiff did suffer from epilepsy. However, the ALJ found Dr. Arias' opinion that the Plaintiff might be suffering from a psychiatric disturbance to be unpersuasive as inconsistent with the medical evidence of record. The ALJ likewise rejected the opinions of Dr. Defeo and Dann as inconsistent with the medical record, as well as with the Plaintiff's testimony at the administrative hearing and statements in his Function Report.

The undersigned notes that each of these psychologists examined the Plaintiff on one occasion and based their findings solely on the Plaintiff's statements and conduct. The Plaintiff clearly would benefit from a finding of incompetency: it would defer or eliminate the criminal proceedings against him. It is particularly noteworthy that only weeks before Dr. Defeo's evaluation, a mental health provider at the Broward County Jail found that the Plaintiff's appearance, speech, mood and affect all were appropriate; thought content was coherent, and thought form was appropriate. The Plaintiff was oriented in all spheres and was of average intelligence. His memory, insight and judgment all were intact, and his behavior was appropriate. Moreover, as emphasized by the ALJ, the Plaintiff provided detailed and coherent

21

information at the administrative hearing.  These facts, combined with the lack of any treatment for cognitive or psychiatric conditions, provide more than substantial evidence to support the ALJ determination to exclude any mental impairment from his residual functional capacity assessment of the Plaintiff.  Moreover, the ALJ's assessment of the Plaintiff's mental impairment was based on all the evidence of record and did not rest exclusively on the opinions of the state agency psychological consultants.  Thus, the consultants' failure to review the opinions of Drs. Arias, Defeo and Dann does not detract from the ALJ's assessment of the record evidence.

### B. Past Relevant Work

Next, the Plaintiff asserts that the ALJ erred by failing to include in the hypothetical present to the VE that the limitation of only moderate exposure to motor vehicles.  According to the Plaintiff, this restriction made it impossible for the Plaintiff to perform his past relevant work as a real estate agent, since it is common knowledge that this job requires driving.  However, as the Commissioner points out, the Dictionary of Occupational Titles (DOT) description of the occupation makes no mention of the need for driving a motor vehicle. U.S. Dept. of Labor, DOT § 250.357-018, 1991 WL 672361 (4th ed. 1991).[1]  The Plaintiff also notes that the DOT's listed

---

1. DOT  § 250.357-018 states that a real estate agent "rents, buys, and sells property for clients on commission basis: Studies property listings to become familiar with properties for sale. Reviews trade journals and attends staff and association meetings to keep informed of marketing conditions, property values, and legislation which would affect real estate industry. Interviews prospective clients to solicit listings. Accompanies prospects to property sites, quotes purchase price, describes features, and discusses conditions of sale or terms of lease. Draws up real estate contracts, such as deeds, leases, and mortgages, and negotiates loans on property. Must have license issued by state. May hold broker's license and be designated Real-Estate Broker (real estate). May assist buyer and seller in obtaining pertinent information or services, such as finance, maintenance, repair, or obtaining an appraisal. May obtain pictures and measurements of rooms, doors, windows, or any other specified areas for inclusion in newspaper advertisement and real estate booklets listing description of property. May inspect property to determine if repairs are needed and notify owner. May conduct seminars and training sessions for sales agents to improve sales techniques. May

characteristics of the job include occasional climbing, while the ALJ's hypothetical the individual is restricted from ever climbing ladders, ropes or scaffolds.  However, the DOT description of the job of real estate agent does not include any requirement of this type of climbing.

In determining the physical and mental demands of a claimant's past work, the ALJ may rely on a VE's testimony and also may consider the job descriptions set forth in the DOT.  Simpson v. Comm'r of Soc. Sec., 440 F. App'x 882, 994 (11th Cir. 2011).  Since the VE's testimony and the DOT support the ALJ's determination that the Plaintiff has the residual functional capacity to perform his past relevant work, the Plaintiff is not entitled to reversal or remand on this ground.

### C. Authority of the ALJ and the Appeals Council

The Plaintiff argues that he was denied his right to a legitimate and valid hearing because the statute governing the appointment of the Commissioner is unconstitutional and, as a result, the Commissioner's delegation of authority to the ALJ and the Appeals Council was invalid.  The Plaintiff contends that he was injured because he was denied his right to a valid administrative adjudicatory process, and seeks remand for a de novo hearing before a new ALJ.

The Plaintiff's argument rests on the Supreme Court's decisions in Seila Law LLC v. Consumer Fin. Prot. Bureau, 140 S. Ct. 2183 (2020) and Collins v. Yellen,141 S. Ct. 1761 (2021).  Both cases dealt with appointment procedures for agency heads which permitted the President to remove those individuals only for cause.  Seila Law dealt with the "for cause" removal restriction on the President's power to remove the director of the Consumer Financial Protection Bureau (CFPB),

---

prepare closing statements, oversee signing of real estate documents, disburse funds, and coordinate closing activities."

holding that this provision violated constitutional separation of powers. However, the Court determined that the unconstitutional removal provision was severable from other provisions relating to the agency's structure.

Collins involved a similar restriction of the President's power to remove the director of the Federal Housing Finance Agency (FHFA). The Court found this provision likewise violated separation of powers, but again determined that the provision was severable. Accordingly, the Court held:

> All the officers who headed FHFA during the time in question were properly *appointed*. Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the FHFA . . . as void.

Collins, 141 S. Ct. at 1787 (emphasis in original).

The action challenged in Collins involved the transfer of billions of dollars in capital to the Department of the Treasury by Fannie Mae and Freddie Mac, which those companies sought to rescind. The Court held that the relief sought was unavailable because the action had been adopted by the Acting Director of the FHFA, who was removable at will. However, the Court also held that the aggrieved parties could be entitled to some form of retrospective relief if they could show that they were directly harmed by unconstitutional removal provision:

> Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in his way. In those situations, the statutory provision would clearly cause harm.

24

Collins, 141 S. Ct. at 1789.  Because the parties disputed whether such a situation existed. the Supreme Court remanded the case for further proceedings.  Id.

In the instant case, the Plaintiff contends that the removal provision applicable to former Commissioner of Social Security Andrew Saul, 42 U.S.C. § 902(a)(3), also violates separation of powers.  That section states that the Commissioner is appointed to a six-year term and may only be removed from office "pursuant to a finding by the President of neglect of duty or malfeasance in office." The Commissioner concedes that § 902(a)(3) "violates the separation of powers to the extent that it is construed as limiting the President's authority to remove the Commissioner without cause." (ECF No. 23 at 10)  Nevertheless, the Commissioner advances two primary arguments against the Plaintiff's position: (1) the ALJ who issued the decision in the Plaintiff's case was not appointed by a Commissioner subject to the § 902(a)(3), since the ALJ's appointment was ratified by an Acting Commissioner who was not subject to the provision, and (2) the Plaintiff has not demonstrated any harm resulting from the removal provision.[2]

The Plaintiff has not cited any case which has adopted his position, and the undersigned could not locate any.  In Stanfird v. Kijakazi, No. 20-cv-1630-GPC (BLM), 2021 WL 5634177, *4 (S.D. Cal. Dec. 1, 2021) and Perez Kocher v. Comm'r of Soc. Sec., 6:20-cv-2357-GKS-EJK, 2021 WL 6334838, *5-6 (M.D. Fla. Nov. 23, 2021), the courts accepted the Commissioner's argument that no relief was warranted because the ALJ who rendered the unfavorable decision in question had been re-appointed by Acting Commissioner Nancy Berryhill.  The undersigned agrees with this conclusion

---

2. The Commissioner cites additional doctrines in response to the Plaintiff's position: harmless error, de facto officer, the rule of necessity and broad prudential considerations (ECF No. 21, 22-25).  Since the undersigned agrees with the Commissioner's two primary arguments, these doctrines will not be addressed.

and finds that it applies to the Plaintiff because the appointment of the ALJ in his case had been ratified by Acting Commissioner Berryhill.

Other cases uniformly have denied relief because the plaintiffs could not demonstrate any harm caused to them by the removal provision.  See, e.g., Carolyn M.D. v. Kijakazi, No. 2:20-cv-06725-AFM, 2021 WL 6135322, *12 (C.D. Cal. Dec. 28, 2021); Rhonda Lynn Tibbetts v. Comm'r of Soc. Sec., No. 2:20-cv-872-SPC-MRM, 2021 WL 6297530, *6 (M.D. Fla. Dec. 21, 2021); Michele T. v. Comm'r of Soc. Sec., No. 3:20-cv-06085-JRC, 2021 WL 5356721, * 5-6 (W.D. Washington, Nov. 17, 2021).  In this regard, the Court in Michele T., 2021 WL 5356721, * 5, noted:

> [T]here is nothing showing the Commissioner or the SSA implemented new and relevant agency action that may have turned upon the President's inability to remove the Commissioner.  Plaintiff has not identified any new regulations, agency policies or directives Commissioner Saul installed that may have affected her claims. . . .
>
> There is also nothing showing former President Trump would have removed Commissioner Saul and appointed a new Commissioner who would have administered this plaintiff's claims differently.

The harm identified by the Plaintiff in the instant case is the fact that he received unfavorable decisions from an ALJ and Appeals Council pursuant to delegation of duties to those officers by Commissioner Saul, who was operating under an unconstitutional removal clause.  Clearly this is not sufficient, as it would apply to virtually every disability case since the enactment of § 902(a)(3) and would render meaningless Collins' requirement of direct harm. See, Carolyn M.D., 2021 WL 6135322, *12. The Plaintiff has failed to demonstrate that the removal provision had any actual or possible impact on the unfavorable decision he received, and no relief is warranted on this ground.  Therefore, the decision of the ALJ should not be disturbed.

## VI. <u>CONCLUSION</u>

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the Plaintiff's Motion for Summary Judgment be DENIED and the Commissioner's Motion for Summary Judgment be GRANTED.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable William P. Dimitrouleas, United States District Judge. Failure to file objections timely shall bar the parties from a <u>de novo</u> determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained therein, except upon grounds of plain error if necessary in the interest of justice. <u>See</u> 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140, 149 (1985); <u>Henley v. Johnson</u>, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 8th day of February, 2022.

_LURANA S. SNOW_
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

All Counsel of Record

27